UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

UNITED STATES OF AMERICA,

     Plaintiff,

v.                       Criminal Case No. 4:15CR00001-001 (RCY)

MARLON J. MOORE,        The Honorable Roderick C. Young

     Defendant.

<u>DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE</u>

<u>PURUSANT TO SECTION 603(B) OF THE FIRST STEP ACT</u>

<u>(AMENDING 18 U.S.C. § 3582(C)(1)(A))</u>

Now comes the Defendant MARLON J. MOORE, by his attorney Tyrone C.

Johnson, and moves this Court to grant his motion for compassionate release under

Section 603(b) of the First Step Act (which amends 18 U.S.C. § 3582(c)(1)(A)), and

order the remainder of his sentence to be served on home confinement or, in the

alternative, issue a non-binding recommendation that the BOP transfer Moore to home

confinement for the duration of Moore's sentence, pursuant to 18 U.S.C § 3624(c), the

CARES Act, and Attorney General Barr's April 3, 2020 and April 22, 2020 Memoranda.

This motion should be granted because the global COVID-19 pandemic combined with

Moore's age (40, DOB September 9, 1981) and medical conditions including

hypertension and obesity, present an "extraordinary and compelling reason" for

compassionate release.

Moore is particularly susceptible to COVID-19 and is more likely to suffer dire

consequences from the virus due to Moore's age and medical conditions.  Moore's

incarceration at Fort Dix FCI exposes Moore to a particularized risk of contracting the

disease. The virus thrives in densely packed populations, and Fort Dix FCI is ill-equipped to contain the pandemic and prevent COVID-19 from spreading to inmates like Moore. Moore, Register Number 85296-083, has a projected release date of December 27, 2031. Allowing Moore to finish out the remaining 121 months of his 202-month sentence in home confinement in the home of his 70-year-old mother, Zenola Moore, who lives at 8615 Gilbert Street, Philadelphia, Pennsylvania, and is a retired elementary school teacher, or in the alternative, in a halfway house allowing for later transition to home confinement, is the only prudent and just response to the extraordinary circumstances created by the novel coronavirus.

Moore is not a danger to the community, and his release plan adheres to the mandates of Section 3553(a), particularly considering the cataclysmic events of this pandemic. We respectfully ask the Court to consider this motion on an expedited basis as the risk to Moore's life multiplies exponentially with each passing day.

## FACTUAL BACKGROUND

1. On March 4, 2015, in accordance with the terms of a written plea agreement, Moore appeared before the Honorable Henry Coke Morgan and pled guilty to Count One and Count Six of a six-count indictment. Count One charged Moore with Conspiracy to Distribute and Possess with Intent to Distribute Cocaine, in violation of 21 U.S.C. § 846 and 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), a Class A Felony (10 years to Life imprisonment, at least 5 years supervised release, $10,000,000 fine and a $100 special assessment). Count Six charged Moore with Interstate Transportation in Aid of Racketeering Enterprises in violation of 18 U.S.C. § 1952(a)(3) and 18 U.S.C. § 2, a

Class D Felony (5 years imprisonment, $250,000 fine, and a $100 special assessment). The Court accepted Moore's pleas on March 4, 2015. Sentencing occurred before the Honorable Henry Coke Morgan on June 2, 2015. Moore's sentencing guideline provisions in the Presentence Investigation Report called for a sentence range of 292 months to 365 months. Moore was sentenced to a 202-month term of imprisonment, with five years of supervised release. (Moore's counsel is uncertain of the precise sentence imposed but calculates that there is 202 months between Moore's being taken into federal custody on February 2, 2015, and his projected BOP release date of December 27, 2031.)

2. Moore notes that on June 1, 2021, he filed an administrative request for compassionate release sentence reduction with the warden at Fort Dix FCI on the same grounds as submitted herein. To the best of Moore's knowledge, the warden has not answered or otherwise acted on Moore's motion for compassionate release. Section 603(b) of the First Step Act amends 18 U.S.C. § 3582(c)(1)(A) in pertinent part to provide that the court, "upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that— **(i)** extraordinary and compelling reasons warrant such a reduction…." On August 2, 2021, this Court appointed Office of the Federal Public Defender to represent Moore for purposes of a compassionate release motion. On

September 22, 2021, the Officer filed a motion to withdraw as Moore's counsel because of a potential conflict and asked the Court to appoint other counsel to represent Moore. On September 28, 2021, this Court appointed Tyrone C. Johnson to file a motion for compassionate release on Moore's behalf. Because of the urgency of the spread of COVID-19, both nationally and within the federal prison system, Moore respectfully asks the Court to waive the 30-day waiting period after this submission for the Court to order compassionate release. Delaying resolution of Moore's motion would expose Moore to undue prejudice considering the rapid development of the pandemic and the significant risk of death.

## SUMMARY OF ARGUMENT

3. First, the Court should exercise its authority to grant Moore's motion for Compassionate Release without full exhaustion or "the lapse of 30 days" from the warden's receipt of Moore's request.[1] See 18 U.S.C. § 3582(c)(1)(A). Courts across the country have waived the 30-day waiting period in response to the unprecedented threat of COVID-19. By enacting the First Step Act of 2018, Congress amended § 3582 to eliminate the BOP as the sole gatekeeper of compassionate release after BOP's documented failure to "properly manage the compassionate release program."[2] Now, a

---

[1] Moore indicated on page 1 of his pro se letter to the Honorable Judge Morgan dated July 21, 2021, that he submitted a "request for a sentence reduction via compassionate release" on June 1, 2021, the written request constituting an administrative motion for compassionate release satisfying the 30-day requirement for exhaustion of administrative remedies.

[2] Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program*, at 11 (April 2013); *see also* Department of Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, at 51 (May 2015) ("Although the BOP has revised its

defendant can seek relief directly from a sentencing court as early as 30 days after submitting a request to a warden asking for the BOP to file such a motion, or after completing an administrative appeal process, whichever occurs first. This 30-day waiting period is a claims processing rule that addresses who files a compassionate release motion; it is not a jurisdictional bar to the Court's exercise of its authority to grant release. The Court should waive the 30-day waiting period to achieve Congress's manifest intent and to protect Moore from undue prejudice.

4. Second, this Court should exercise its authority to grant Moore compassionate release because the COVID-19 pandemic combined with Moore's unique susceptibility to COVID-19, given his age (40) and medical issues including high blood pressure and obesity (weight more than 225 pounds), is an "extraordinary and compelling" reason warranting relief. If Moore remains incarcerated, Moore faces an unacceptable risk of contracting and dying from COVID-19. As of November 25, 2021, BOP reported that 42,290 inmates and 8,457 BOP staff members have tested positive for COVID-19; 267 federal inmates and 7 BOP staff members have died as a result.[3] These figures underestimate COVID-19's real toll "given the paltry number of tests the federal government has made available at some BOP facilities,"[4] and because BOP only

---

compassionate release policy to expand consideration for early release to aging inmates, which could help mitigate the effects of a growing aging inmate population, few aging inmates have been released under it.").

[3] Federal Bureau of Prisons, COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/ (includes recovered cases).

[4] *See, e.g., Wilson v. Williams*, No. 4:20-cv-00794, 2020 WL 1940882 at *2 (N.D. Ohio April 22, 2020) (FCI Elkton received only 50 tests); *see also Louisiana federal prison no longer testing symptomatic inmates for coronavirus due to 'sustained transmission'*, The Lens (March 31, 2020), available at https://thelensnola.org/2020/03/31/louisiana-federal-prison-no-longer-testing-symptomatic-inmates-for-coronavirus-due-to-sustained-transmission/

announced on April 23, 2020 that it would begin to test asymptomatic inmates, and has only done so at select facilities.[5]  According to BOP Director Michael Carvajal, "more than 30% of our prisons are currently affected," including 107 BOP facilities and 43 Residential Re-Entry Centers (RRCs), and institutions are "hotspots" for COVID-19.[6]  As of November 25, 2021, Fort Dix FCI has had 1622 confirmed cases of COVID-19 among inmates and 101 confirmed cases of COVID-19 among staff members, including six currently positive COVID-19 cases among staff members.  Although most inmates contracting COVID-19 have recovered, there have been two deaths from COVID-19 among inmates at Fort Dix FCI.[7]  According to the COVID Prison Project, as of November 23, 2021,  there have been 439,174 COVID-19 cases among

people incarcerated in federal and non-federal prisons in the United States, and 2,660 deaths of incarcerated individuals in federal and non-federal prisons in the United States due to COVID-19.[8]  According to the UCLA Law COVID Behind Bars Data Project, as of November 25, 2021, there are 4,806 cumulative cases of COVID-19 among incarcerated people in New Jersey state adult prisons, a rate of 2,606 per 10,000 cases, and there are 2,018 cumulative cases of COVID-19 among incarcerated people in New

---

[5] *Federal prison system expands virus testing to find hidden asymptomatic infections*, USA Today (April 23, 2020), https://www.usatoday.com/story/news/politics/2020/04/23/coronavirus-federal-prisons-expand-testing-asymptomatic-inmates/3015287001/; *BOP expands COVID-19 Testing: Rapid Testing Available at Select Facilities,* Federal Bureau of Prisons (April 24, 2020, https://www.bop.gov/resources/news/20200424_expanded_testing.jsp
[6] BOP Direct Michael Carvajal's Message to Prison Staff (April 10, 2020), Transcript available at https://prisonology.com/wp-content/uploads/2020/04/COVID-19-Video-transcript-of-BOP-Director-Michael-Carvajal.pdf
[7] Federal Bureau of Prisons, COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/
[8] The COVID Prison Project, available at https://covidprisonproject.com.

Jersey federal prisons, a rate of 4,750 per 10,000 cases, and a cumulative death rate of 7 per 10,000 cases.[9] The UCLA Law COVID Behind Bars Data Project complied State DOC Data Grade for each state, which represents its assessment of the transparency and quality of those data reported by each state, including New Jersey. The grade it gave to New Jersey was an **F.[10]**

5. The alarming spread of COVID-19 in BOP facilities confirms that, despite its efforts, BOP cannot safeguard prisoners. For example, from April 21 to April 29 – more than three weeks after BOP implemented Phase 5 of its COVID-19 Action Plan and inmate quarantine – Terminal Island FCI reported a 1,000% increase of new positive cases (from 57 inmates to 570 inmates).[11] This is not an outlier; during the same period Fort Worth FMC positive inmate cases increased from 35 to 298, and at Butner Medium I cases increased from 27 to 212.[12] Courts have criticized BOP's overall response as "insufficient" given "the number of infections and deaths which have already occurred in federal custodial institutions,"[13] and one court described BOP's efforts at FCI Elkton as fighting "a losing battle. A losing battle for staff. A losing battle for inmates." *Wilson v. Williams*, No 4:20-cv-00794, 2020 WL 1940882, at *1 (N.D. Ohio April 22, 2020).

---

[9] The UCLA Law COVID Behind Bars Data Project, available at https://uclacovidbehindbars.org/states/new-jersey.

[10] The UCLA Law COVID Behind Bars Data Project, available at https://uclacovidbehindbars.org/states/new-jersey.

[11] Federal Bureau of Prisons, COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/

[12] The Marshall Project, *Tracking the Spread of Coronavirus in Prisons* (April 24, 2020), available at https://themarshallproject.org/2020/04/24/tracking-the-spread-of-coronavirus-in-prisons ("The number of new cases among prisoners is more than doubling each week….").

[13] *United States v. Joling*, No. 6:11-cr-60131-AA, 2020 WL 1903280, at *5 (D. Or. April 17, 2020).

6. Even in the best circumstances, inmates cannot provide self-care because their incarceration prevents them from following CDC guidance: "People in jails and prisons cannot practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning and laundry, avoid frequently touched surfaces, or sanitize their own environment." *United States v. Skelos*, 15-CR-317 (KMW), 2020 WL 1847558, at *1 (S.D.N.Y. April 12, 2020). There are serious doubts that BOP will be able to adequately care for prisoners as the COVID-19 pandemic continues to unfold.[14] For these reasons, federal courts nationwide have held that COVID-19 constitutes an extraordinary and compelling basis for ordering compassionate release for defendants facing a rapidly growing mortal threat from exposure to the coronavirus in federal prisons.[15] In light of the specific threat Moore faces, this Court should do the same.

7. Third, the Section 3553(a) factors warrant Moore's release. Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of sentencing. The code section governing imposition of a

---

[14] The Inspector General has found widespread medical staffing shortages across BOP facilities that "lower staff morale, increase staff workload, and ultimately can reduce inmates' access to routine medical care." *Review of the Federal Bureau of Prisons' Medical Staffing Challenges,* Office of the Inspector General, (March 2016), available at https://oig.justice.gov/reports/2016/e1602.pdf

[15] Defendant's counsel has a list of at least 197 district court cases across the country where the court held that the COVID-19 virus outbreak constituted an extraordinary and compelling reason for compassionate release. Since the release of the Attorney General's original memo to the Bureau of Prisons on March 26, 2020, instructing BOP to prioritize home confinement as an appropriate response to the COVID-19 pandemic, the total number of BOP inmates placed on home confinement from March 26, 2020, to the present (November 25, 2021) is 34,826 inmates. *See* Federal Bureau of Prisons, COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/

sentence, 18 U.S.C. § 3553(a), requires a court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. In determining the sentence minimally sufficient to comply with Section 3553(a)(2) purposes of sentencing, the court must also consider factors including "(1) the nature and circumstances of the offense and the history and characteristics of the defendant…." Paragraph 15 of Moore's Presentence Investigation Report, which included a two-level adjustment for acceptance of responsibility, noted that Defendant, the holder of a 2005 bachelor of science degree from Hampton University, expressed significant remorse about his offense of distribution of cocaine: "The defendant was interviewed by the probation officer and provided a statement wherein he admitted involvement in the offense…. He stated that he is disappointed in himself and expressed remorse for his conduct. The defendant reported that he would not repeat the offense."

## ARGUMENT

I. **The Court has Jurisdiction to Grant Moore Compassionate Release Without Delay**.

8. By enacting the landmark First Step Act of 2018, Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to allow, for the first time, defendants to move on their own behalf for a reduction of sentence. A defendant may file such a motion when she "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, *whichever is earlier*[.]" First Step Act of 2018, § 603(b), Pub. L. 115- 391, 132 Stat.. 5194, 5239 (Dec. 21, 2018 (emphasis

added). Congress selected this exceptionally short 30-day waiting period to expedite defendants' access to the courts and the courts' consideration of compassionate release motions. *See, e.g., United States v. Haney*, 19-cr-541 (JSR), 2020 WL 1821988, at *3 (S.D.N.Y. April 13, 2020).

9. Here, while the 30-day waiting period has not yet passed, this Court should address Moore's Motion without delay. Section 3582(c)(1)(A)'s 30-day waiting period is a claims processing rule that describes who files a compassionate release motion; it is not a jurisdictional bar to the Court's authority to grant compassionate release. Because it is not a jurisdictional bar and considering Congress's clear intent to expand and expedite compassionate release, the 30-day waiting period provision is subject to well-recognized exceptions to administrative exhaustion schemes. In particular, the Court should not require a 30-day delay because waiting would be futile and would cause Moore undue prejudice considering the mortal threat posed by the rapid spread of the virus in prison populations and Moore's particular susceptibility to serious illness and death from the virus arising from his high blood pressure and obesity.

A. The 30-day waiting period is not a jurisdictional requirement.

10. The Court may grant a sentence reduction now because §3582(c)(1)(A)(i) addresses only the process for filing a motion; it does not restrict the Court's jurisdiction to grant compassionate release. The Supreme Court has "stressed the distinction between jurisdictional prescriptions and non-jurisdictional claim-processing rules, which seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times." *Fort Bend Cty., Texas v. Davis*, 139 S. Ct.

1843, 1849 (2019).[16]  To distinguish between the two, a court applies a "readily administrable bright line" standard: it inquires whether Congress has "clearly stated that the rule is jurisdictional."  *Sebelius v. Auburn Reg'l Med. Ctr.,* 568 U.S. 145, 153 (2013) (citation omitted).  When Congress does not clearly create a jurisdictional bar, "courts should treat the restriction as non-jurisdictional in character."  *Davis*, 139 S. Ct. at 150 (quoting *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 516 (2006).

11.  Courts apply the "clear statement" bright line standard by "considering the statutory text (if it speaks in 'jurisdictional terms'); the placement of the rule (if it is located in the jurisdiction-granting provision of the statute); and legislative context." *Stewart v. Iancu*, 912 F.3d 693, 699-700 (4th Cir. 2019).  All these considerations establish that the administration exhaustion provision of 18 U.S.C. § 3582(c)(1)(A)(i) functions merely as a claims processing rule, not a jurisdictional requirement.

i. The statutory text confirms the 30-day waiting period is not jurisdictional

12. The statutory text of § 3582(c)(1)(A) does not address the court's jurisdiction; it merely promotes the "orderly progress of litigation" by stipulating *which party* will file a compassionate release motion and allows prisoners to move on their own behalf after 30 days from BOP receipt of an inmate's request to file such a motion.  "A statutory condition that requires a party to take some action before filing a lawsuit is not automatically 'a *jurisdictional* prerequisite to suit'"; instead, "the jurisdictional analysis must focus on the 'legal character' of the requirement."  *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 166 (2010) (emphasis in original); *see also Stewart*, 912 F.3d at 701

---

[16] *See also Henderson v. Shinseki*, 562 U.S. 428, 435 (2011) (claims processing rules "seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times.").

("Simply because [Title VII's] 180-day waiting period is 'cast in mandatory language' does not render it jurisdictional."). And here, the legal character of the 30-day waiting period "simply delineates the process for a party to obtain judicial review, [and does] not refer[ ] to the adjudicatory capacity of courts." *Haney*, 2020 WL 1821988, at *3 (concluding that "the exhaustion requirement in § 3582(c)(1)(A) is a claim-processing rule that does not deprive this Court of jurisdiction").

ii.  The placement of the 30-day waiting period confirms it is not jurisdictional.

13.  The "exhaust or wait 30 days" provision is not placed in the jurisdiction-granting provision of the statute; it is in the "part of the chapter dealing generally with sentences of imprisonment." *See United States v. Taylor*, 778 F.3d 667, 671 (7th Cir. 2015). "Tellingly, the word 'jurisdiction' or its variation never appears" in § 3582. *Haney*, 2020 WL 1821988, at *3. Moreover, § 3582 expressly ***confirms*** the courts' sentencing modification authority. Though § 3582(c) states that the "court may not modify a term of imprisonment once it has been imposed," that provision follows § 3582(b), which states that "a sentence to imprisonment can subsequently be modified "pursuant to" certain provisions. In short, § 3582(c)(1)(A) merely sets forth a procedure "pursuant to" which sentence modifications are made; it does not divest or condition the courts' jurisdiction.

iii.  The unique structure and legislative context of the 30-day waiting period confirms it is not jurisdictional.

14.  By enacting the First Step Act, Congress removed the BOP as the sole gatekeeper of compassionate release and expedited defendants' access to the courts. In allowing defendants to seek compassionate release directly from federal courts, Congress

implemented a modest procedural hurdle – "either exhaust or wait 30 days" – that "substantially reduces the importance" of protecting BOP authority by allowing a defendant to come to court before the agency has rendered a final decision." *Haney*, 2020 WL 1821988, at *3. Moreover, the First Step Act followed the Inspector General's critical assessment of the previous compassionate release framework: "not all [BOP] institutions have timeliness standards, and for those institutions that do, the timeframe ranges from 5 to 65 days"; "the process available to inmates to appeal a Warden's or Regional Director's denial of a compassionate release request can take up to more than 5 months to complete"; and that "BOP cannot determine if requests are processed in a timely manner because the BOP does not track the time it takes to approve or deny requests."[17] Congress intended to expand and expedite judicial review of compassionate release motions, and it chose the unique and exceptionally short 30-day waiting period to effect that result. Treating the 30-day waiting period as jurisdictional would ignore the statutory structure and thwart these purposes by abdicating the authority that Congress intends the Courts to exercise.

　　　iv. <u>Treating the 30-day waiting period as non-jurisdictional is most consistent with Fourth Circuit precedent</u>.

　　　15. Though the Fourth Circuit has not addressed whether the 30-day waiting period in § 3582(c)(1)(A) is jurisdictional,[18] it has provided instructive guidance in

---

[17] Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program*, at ii-iii (April 2013).

[18] The Fourth Circuit has held that the implicit prohibition on motions to reconsider a sentence reduction pursuant to § 3582(c)(2) based upon a retroactive amendment to the Sentencing Guidelines is not jurisdictional and may be waived. *See United States v. May*, 855 F.3d 271, 274-75 (4th Cir. 2017) (recognizing a "non-jurisdictional" bar to § 3582(c)(2)-based motions for reconsideration).

addressing a similar exhaustion provision in Title VII. *See Stewart*, 912 F.3d at 699-704.

Section 2000e-16(c) of Title VII allows employees and job applicants to bypass

administrative exhaustion of their discrimination claims when a government agency fails

to "take final action" within 180 days of filing an initial complaint. As the Fourth Circuit

noted, "Unlike most administrative exhaustion requirements premised on agency action

… the 180-day waiting period is satisfied by agency *inaction*." *Id.* Moreover, "Congress

passed Section 2000e-16(c) of Title VII in 1972 precisely because of its recognition that

federal employees frequently encountered an 'administrative quagmire' in filing charges

of discrimination." *Id.* at 699. The Fourth Circuit thus concluded that Title VII's 180-

day waiting period is "akin to a 'claim-processing' rule that imposes procedural

obligations on litigants … [and] is not jurisdictional." *Id.* at 701. Because the 30-day

waiting period under § 3582(c)(1)(A) is likewise satisfied by agency inaction and was

enacted to counteract prisoners' inability to seek compassionate release, the same

reasoning applies here.

      B.  <u>Waiver of the 30-day waiting period is consistent with Congressional intent</u>.

      16. The Court may waive the 30-day waiting period if waiver is consistent with

Congress's intent as evidenced by the statutory context and purposes. Where "Congress

wanted more oversight by the courts," even a statutory exhaustion requirement may be

"excused by the courts." *Smith v. Berryhill*, 139 S. Ct. 1765, 1774, 1776 (2019). Here,

Congress plainly intended to expand and expedite compassionate release by giving

prisoners a direct path to the Courts. Because it allows a complete circumvention of BOP

action after the lapse of 30 days, Section 3582's exhaustion provision undercuts the

typical purposes of administrative exhaustion: allowing an agency to apply its expertise;

preventing premature judicial interference; and compiling an administrative record to aid judicial review.  While BOP may recommend cases to the Court, the statutory scheme does not depend on BOP's recommendations, and the Court must ultimately decide whether to grant relief in all cases regardless of BOP's consideration.  *United States v. Soto*, No. 1-18-cr-10086-IT, 2020 WL 1905323, at *5 (D. Mass. April 17, 2020) ("Although waiting thirty days may simplify matters for the court where the BOP joins the motion, the waiting period will not eliminate the need for judicial involvement.").  The provision thus "does not reflect unqualified commitment to administrative exhaustion"; to the contrary, it "reflect[s] acknowledgment that the judiciary has an independent interest in, and responsibility for, the criminal judgments it is charged with imposing."  *United States v. Russo*, No. 16-cr-441 (LJL), 2020 WL 1862294, at *6 (S.D.N.Y. April 14, 2020).

17.  Congress could not predict the unprecedented threat that prisoners face from COVID-19, but the 30-day waiting period was designed to prevent inequitable results in similar circumstances where BOP's many demands prevent it from promptly considering compassionate release requests.  Given "the multiple demands that the BOP has faced for many years in this era of mass incarceration [the Court] can reasonably infer that Congress recognized that there would be many cases where the BOP either could not act within 30 days on such a request or, even if it did act, its review would be superficial."  *Haney*, 2020 WL 1821988, at *3.  The statutory text reflects that "Congress was determined not to let such exigencies interfere with the right of a defendant to be heard."  *Id*.  "In essence, the 30-day rule was meant as an accelerant to judicial review … and it would pervert congressional intent to treat it as a substantial obstacle to effective judicial

review." *United States v. Russo*, No. 16-cr-441 (LJL), ECF No. 54, at 5 (S.D.N.Y. April 3, 2020); *United States v. Atwi*, No. 18-20607, 2020 WL 1910152, at *3 (E.D. Mich. April 20, 2020) ("Congress contemplated that a defendant would be able to seek court redress quickly. But the 30 days when the statute was passed and 30 days in the world of COVID-19 are very different."). Accordingly, when "BOP has not been able to satisfy its obligation to act expeditiously … or to assure the Court it can do so … the Court can exercise the power Congress has given it" in the extraordinary circumstances of COVID-19. *Russo*, 2020 WL 11862294, at *7.[19] The statute's plain text – both its distinctive structure and its title – therefore supports the application of equitable exceptions.

C. The Court should waive exhaustion because Moore is at grave risk of contracting a fatal disease and pursuing administrative remedies would be futile and unduly prejudicial.

18. Because the § 3582 (c)(1)(A) waiting period is non-jurisdictional, the Court may excuse Moore's failure, if any, to exhaust his administrative remedies if: 1) exhaustion would be futile; 2) the administrative process is incapable of granting adequate relief; or 3) pursuing agency review would subject Moore to undue prejudice. *See, e.g., Orr v. Assurant Employee Benefits*, 786 F.3d 596, 602 (7th Cir. 2015).[20] As

_____

[19] *See also United States v. Scparta*, No. 18-cr-578 (AJN), 2020 WL 1910481, at *7 (S.D.N.Y. April 20, 2020) ("In short, a strict application of the statute's exhaustion requirement would foreclose judicial review for inmates like Mr. Scparta, therefore posing risks to prisoners, guards, and the public – the opposite of the First Step Act's legislative purpose."); *cf. Gonzales v. Thaler*, 565 U.S. 134 (2012) ("Treating § 2253(c)(3) as jurisdictional also would thwart Congress's intent in AEDPA to eliminate delays in the federal habeas review process." (quotation omitted); *Stewart*, 912 F.3d at 703 ("Our conclusion also comports with the broader purposes of Title VII as a remedial scheme in which laypersons, rather than lawyers, are expected to initiate the process.").
[20] *See also Garza v. Davis*, 596 F.3d 1198, 1203-04 (10th Cir. 2010) (recognizing futility exception in context of § 2241 petition).

Judge Raymond Jackson held, "The COVID-19 pandemic, which could result in catastrophic health consequences for petitioners vulnerable to infection, implicates all three exceptions justifying the waiver of the exhaustion requirement." *United States v. Paulios*, No. 2:09-cr-00109-RAJ-TEM, 2020 WL 1922775, at *1 (E.D. Va. April 21, 2020).

19. Indeed, given COVID-19's unprecedented and unique threat to people confined in prisons, courts throughout the country have applied these well-recognized exceptions in waiving exhaustion under § 3582(c)(1)(A). *See, e.g., Haney*, 2020 WL 1821988, at *4. ("Congressional intent not only permits judicial waiver of the 30-day exhaustion period, but also, in the current extreme circumstances, actually favors such waiver, allowing courts to deal with the emergency before it is potentially too late."); *United States v. Jones*, No. 3:11-cr-249, Dkt. No. 47 (E.D. Va. April 3, 2020) ("Given Jones' unique circumstances and the exigency of a rapidly advancing pandemic, requiring Jones to exhaust administrative remedies would result in undue prejudice and render exhaustion of the full Bureau of Prisons administrative process both futile and inadequate."[21]

---

[21] *See also United States v. Sawicz*, No. 08-cr-287 (ARR), 2020 WL 1815851, at *2 (E.D.N.Y. April 10, 2020) ("The delay that the defendant would experience if he had to wait for thirty days to expire before pursuing a motion for compassionate release in this court would put him at significant risk of suffering catastrophic health consequences."); *United States v. Colvin*, No. 19-cr-179, 2020 WL 1613943, at *2 (D. Conn. April 2, 2020) (requiring exhaustion would subject defendant to "undue prejudice – the heightened risk of severe illness – while attempting to exhaust her appeals."); *United States v. McCarthy*, No. 3:17-CR-0230, 2020 WL 1698732, at *4 (D. Conn. April 8, 2020) (waiving exhaustion where defendant's "age and underlying health issues, when considered in light of the spread of COVID-19, demonstrate that further delay would likely result in such catastrophic health consequences, including death."); *United States v. Zukerman*, 16 CR 194, 2020 WL 1659880, at *4 (S.D.N.Y. April 3, 2020) (Defendant's "advanced age and compromised health, combined with the high risk of contracting

i. Futility

20.  Pursuing administrative remedies would be futile in this case because BOP has presumptively deemed Moore ineligible for relief.  BOP represented that, on March 26, 2020, it "began immediately reviewing all inmates who have COVID-19 risk factors … to determine which inmates are suitable for home confinement."[22]  Because BOP has not identified Moore for early release or home confinement, and because BOP has made no representation that it intends to grant Moore's request for compassionate release filed June 1, 2021, the Court can find that BOP has deemed Moore unsuitable for home confinement or early release.  Accordingly, it would be futile to pursue his administrative remedies.[23]

ii. Inadequate Relief

21.  Second, any relief that could be granted through the administrative process would be plainly inadequate because it would require Moore to suffer irreparable harm by continuing to face the lethal threat of COVID-19.  BOP typically takes months to address inmate requests for compassionate release even under better conditions.[24]  Given

COVID-19 at Otisville, justify waiver of the exhaustion requirement."); *United States v. Perez*, No. 17-cr-513-3, 2020 WL 1546422, at *1 (S.D.N.Y. April 1, 2020) (Defendant's "exhaustion of the administrative process [under the First Step Act] can be waived in light of the extraordinary threat posed – in his unique circumstances – by the COVID-19 pandemic.").

[22] Federal Bureau of Prisons, *COVID-19 Home Confinement Information*, available at https://www.bop.gov/coronavirus/

[23] *Cf. United States v. Chatelain*, No. 1:19-cr-133, Dkt. No. 73 (E.D. Va. May 1, 2020) (requiring defendant to appeal or wait 30 days "would be futile and inadequate and would subject [defendant] to undue prejudice" where BOP issued a pro forma denial of defendant's compassionate release request).

[24] *See* BOP Report on Compassionate Release, at ¶G (showing that non-terminal illness compassionate release requests took on average between 58 and 117 days to be addressed by the BOP).

the pandemic, the system is undoubtedly overwhelmed, further delaying the process, and exposing Moore to an increasing risk of infection, serious illness, or even death. That risk is an irreparable harm that renders relief inadequate. *See, e.g., United States v. Gileno*, No. 3:19-cr-161-(VAB)-1, 2020 WL 1916773 (D. Conn. April 20, 2020) ("An unyielding view of the exhaustion requirement is likely to render the BOP incapable of granting adequate relief….").

### iii. Undue Prejudice

22. Finally, forcing Moore to exhaust his administrative remedies would be unduly prejudicial. Moore's health is negatively impacted by the outbreak even though he has not yet been infected. The conditions at BOP and in particular at Fort Dix FCI prejudice Moore's ability to follow the CDC's hygiene and social distancing recommendations, which prejudice her ability to avoid infection in an environment extremely conducive to spread of infection. As Moore noted in his pro se letter to Judge Moore dated July 21, 2021, "Conditions here at FCI Fort Dix are atrocious, to put it lightly…. There are no programs, no hygiene protocols enforced, except an inconvenient announcement directing inmates to wash their hands after touching surfaces. Last year I watched as two men within my own building died because of the mistreatment by the medical staff here…. For example, in my building (5702), two inmates tested positive for COVID-19 during the height of the pandemic. These two inmates were moved from their 12-man cells to quarantine. The ten remaining inmates [were] moved into other 12-man cells, where there were open bunks. Several days later, those inmates moved from the initial cell [began] to show signs of COVID-19, infecting their new cellmates. This pattern would simply be repeated until the entire building was infected…. I'm asking

Your Honor to please grant me a sentence reduction based on the time I've spent under the extremely extraordinary [and] harsh conditions."

23.  Fort Dix FCI is currently operating under a Modified Operational Level, Level 3, due to COVID-19, which requires "intense modifications."  Institution operational levels (Level 1, Level 2, or Level 3) are based on the facilities' COVID-19 medical isolation rate, combined percentage of staff and inmate completed vaccinations series, and their respective county transmission rates.  At each level, an infection prevention procedure or modification to operations such as inmate programming and services may be made to mitigate the risk and spread of COVID-19 in accordance with BOP pandemic guidance.  BOP pandemic guidance seeks to integrate guidance and direction from CDC, OSHA, DOJ, and established medical best practices.

**Level Indicators**

BOP COVID-19 Operational Levels are raised or lowered after 48 hours of respective sustained increases or decreases in the following indicators:

## Level 1



**IF** Medical isolation rate < 2% **AND** Facility vaccination rate ≥ to 65% **AND** Community transmission rate is < 50 per 100,000 over the last 7 days

## Level 2



**IF** Medical isolation rate 2% to < 7% **OR** Facility vaccination rate 50% to < 65% **OR** Community transmission rate is 50-99 per 100,000 over the last 7 days

## Level 3



**IF** Medical isolation rate ≥ 7% **OR** Facility vaccination rate < to 50% **OR** Community transmission rate ≥ 100 per 100,000 over the last 7 days

24.  Given the poor conditions at Fort Dix FCI described above, Moore could become extremely ill (or worse), a prejudice that is plainly undue.  *See Paulios*, 2020 WL 1922775, at *3 ("Preservation of the exhaustion requirement could subject Petitioner to severe illness and death if he contracts COVID-19 because of his underlying health conditions."); *United States v. Love*, No. 1:14-cr-4-1, Dkt. No. 41 (W.D. Mich. April 21, 2020) ("[A] 30-day delay would likely cause catastrophic health effects.  Such a consequence would be unduly prejudicial.").

## II.  The COVID-19 Pandemic Presents an Extraordinary and Compelling Reason for Moore's Compassionate Release Due to Moore's Particular Vulnerability.

A.  This Court can determine that COVID-19 presents an extraordinary and compelling reason for compassionate release.

25.  Under Section 3582(c)(1)(A)(i), this Court "may reduce the term of imprisonment" if it finds that "extraordinary and compelling reasons warrant such a reduction … and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]"  The Sentencing Commission has issued a policy statement that provides factual considerations for determining whether compassionate release is appropriate.  Those considerations include three enumerated categories of "reasons" – relating to defendant's medical condition, age, and family circumstances – as well as a "catchall" provision: any "other reasons" as determined by

the BOP. U.S.S.G. § 1B1.13, Application Note 1(A).[25] However, this policy statement is outdated[26] and inconsistent with the First Step Act to the extent it provides that only the BOP may determine what "other reasons" qualify as "extraordinary and compelling." It is the Court's role to determine what "other reasons" warrant compassionate release, notwithstanding the Commission's outdated policy statement that provided for BOP to make that determination. *See United States v. Maumau*, No. 2:08-cr-758-TC, 2020 WL 806121, at *7-8 (D. Utah Feb. 18, 2020). Numerous courts have recognized the judicial authority to find that compassionate release is warranted for "other reasons" than those set forth in U.S.S.G. § 1B1.13. *See, e.g., United States v. Paulios*, No. 2:09-cr-00109-RAJ-TEM, 2020 WL 1922775, at *2 (E.D. Va. April 21, 2020) ("[T]he Court may consider a combination of factors including but not limited to those listed in Application Note 1 in evaluating a petitioner's request for a sentence modification under the "catch-all" provision."); *United States v. Redd*, No. 1:97-cr-00006-AJT, 2020 WL 1248493, at *8 (E.D. Va. March 16, 2020) ("The Court joins other courts in concluding that a court may find, independent of any motion, determination, or recommendation by the BOP Director, that extraordinary and compelling reasons exist based on facts and

---

[25] Additionally, the commentary makes clear that the extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." U.S.S.G. § 1B1.13, Application Note 2. In other words, even if an "extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court, [that fact] does not preclude consideration for a [sentence] reduction." *Id.*

[26] Since the passage of the First Step Act, there have not been enough commissioners to update the Commission's policies or amend the Sentencing Guidelines. *See United States v. Brown*, No. 4:05-CR-00227-1, 2019 WL 4942051, at *2 n. 1 (S.D. Iowa Oct. 8, 2019) ("As district courts have noted often this year, the Sentencing Commission has not amended the Guidelines following the First Step Act and cannot do so until it again has four voting commissioners.").

circumstances other than those set forth in U.S.S.G. § 1B1.13 cmt. N.1(A)-(C)").  There is ample precedent to support compassionate release considering prisoners' particular susceptibility and vulnerability to COVID-19.  Courts in the Fourth Circuit and across the country have found that a defendant's heightened risk and particular vulnerability to COVID-19 in prison constitutes an "extraordinary and compelling reason" in favor of compassionate release.[27]

26.  Alternatively, this Court has also recognized the "gross disparity" between the sentence that the defendant received and the sentence that he would have received after passage of the First Step Act presented an "extraordinary and compelling reason" for compassionate release.  *Redd*, 2020 WL 1248493.  Although the Court's decision in *Redd* did not address the coronavirus (it was not at issue), it speaks to the issue presented here: if Moore is not released, he faces a potential death sentence, which is not what

---

[27] *See, e.g., United States v. Paulios,* No. 2:09-cr-00109-RAJ-TEM, 2020 WL 1922775, at *3 (E.D. Va. April 21, 2020) (finding "extraordinary and compelling reasons to modify [defendant's] sentence because of the great risk that COVID-19 poses to a person of [defendant's] age with underlying health conditions."); *Dinning v. United States*, No. 2:12-cr-84, 2020 WL 1889361, at *2 (E.D. Va. April 16, 2020) ("[T]he confluence of petitioner's medical conditions and the COVID-19 pandemic may constitute an extraordinary and compelling reason for sentencing modification…."; *United States v. Jones*, No. 3:11-cr-249 (E.D. Va. April 3, 2020) (granting compassionate release and converting remainder of sentence to home confinement in light of "the current public health crisis caused by COVID-19"); *United States v. Edwards*, No. 6:17-cr-3-NKM, 2020 WL 1650406, at *6 (W.D. Va. April 2, 2020) (granting compassionate release); *United States v. Collins*, No. CCB-10-336, 2020 WL 1506176 (D. Md. March 30, 2020) (granting compassionate release to a "non-violent drug offender who has already served a lengthy sentence" even though "it has not been proffered that [defendant] has an underlying health condition which makes him more susceptible to the effects of the virus, and while the risks posed by a defendant's continued residence in a detention facility do not necessarily mandate release"); *United States v. Copeland*, No. 2:05-CR-135-DCN (D.S.C. March 24, 2020) (granting compassionate release in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments defendant has during this current pandemic").

Congress or the Court intended at sentencing. *See, e.g., Edwards*, 2020 WL 1650406, at *6 ("Had the Court known when it sentenced Defendant in 2018 that the final 18 months of his term in federal prison would expose him to a heightened and substantial risk presented by the COVID-19 pandemic on account of Defendant's compromised immune system, the Court would not have sentenced him to the latter 18 months."). The Court may grant compassionate release to avoid such a gross disparity.

B. Moore is particularly susceptible to contracting COVID-19 because of his conditions of confinement.

27. Since January 2020, COVID-19 has spread widely and rapidly throughout the United States. Positive cases have been confirmed in all 50 states and the District of Columbia.[28] Since March 21, 2020, the total number of confirmed cases in the United States has skyrocketed from 15,219 to 47,916,623, as of November 24, 2021; the number of deaths has risen from 201 to 773,779, as of November 24, 2021, with a current 7-day case rate per 100,000 of 198.8.[29] As of November 25, 2021, BOP reported that 42,290 inmates and 8,457 BOP staff members have tested positive for COVID-19; 267 federal inmates and 7 BOP staff members have died as a result.[30] As of November 25, 2021, Fort Dix FCI, a low security federal correctional institution with 3213 inmates located at 5756 Hartford & Pointville Road, Joint Base MDL, NJ 08640, has had 1622 confirmed cases of COVID-19 among inmates, including two inmate deaths, and 101 confirmed

---

[28] *See* Center for Disease Control, *COVID-19 Cases in the U.S.,* available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html
[29] *Id*.
[30] Federal Bureau of Prisons, COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/ (includes recovered cases).

cases of COVID-19 among staff members, including six currently positive COVID-19 cases among staff members.[31]

28. These numbers are growing every day, and almost certainly understate the problem, as the United States in general, and prisons in particular, are vastly behind where they need to be in testing for this virus. Given the rapid onset of symptoms and the fact that many carriers are asymptomatic, the unfortunate reality is that once there is a positive case, it may be too late to prevent further spread in a prison. The nation's prison system is particularly ill-equipped to manage the spread of a disease as contagious and deadly as COVID-19. COVID-19 can enter a facility and spread rapidly, entirely undetected. Indeed, the Director of the CDC warned that up to 25 percent of people infected with COVID-19 "may not show symptoms."[32] The virus has already spread rapidly in BOP and state prison facilities.[33] Due to the crowded and confined nature of a detention facility, the spread of the virus in the prisons and jails is far outpacing the spread in the community.

---

[31] Federal Bureau of Prisons, COVID-19 Tested Positive Cases, available at https://www.bop.gov/coronavirus/
[32] Apoorva Mandavilli, "Infected but Feeling Fine: The Unwitting Coronavirus Spreaders," *New York Times* (March 31, 2020), available at https://www.nytimes.com/2020/03/31/health/coronavirus-asyptomatic-transmission.html; *see also* CDC, "How Coronavirus Spreads" webpage ("Some recent studies have suggested that COVID-19 may be spread by people who are now showing symptoms."), available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html
[33] *See* Timothy Williams, Benjamin Weiser, and William K. Rashbaum, "'Jails Are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars," *New York Times* (March 30, 2020), available at https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html ("Hundreds of COVID-19 diagnoses have been confirmed at local, state, and federal correctional facilities – almost certainly an undercount, given a lack of testing and the virus's rapid spread – leading to hunger strikes in immigrant detention centers and demands for more protection from prison employee unions.").

29.  Conditions of confinement create the ideal environment for the transmission of contagious disease.[34]  In fact, the top two hotspots of COVID-19 in the United States are both prisons: Marion Correctional Institution reported that 81% of its population (2,011 inmates) have tested positive, and Pickaway Correctional Institution reported 77% (1,536 inmates) have tested positive.[35]  "Prisons are petri dishes for contagious respiratory illnesses."[36]  Inmates cycle in and out of jails and prisons, and people who work in the facilities leave and return daily.  According to public health experts, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe … infection control is challenging in these settings."[37]  Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[38]  The conditions of confinement not only affect incarcerated individuals, but also the community at large.  "With 2.3 million people in the United States in prison or jail on any given day, an outbreak in these facilities poses a threat to

---

[34] Joseph A. Bick, "Infection Control in Jails and Prisons," *Clinical Infectious Diseases* 45(8):1047-1055 (2007), available at https://doi.org/10.1086/521910

[35] Catherine Candisky, "Coronavirus surges at Pickaway prison, now No. 2 hot spot in nation – behind Marion prison," *The Columbia Dispatch* (April 23, 2020), available at https://www.dispatch.com/news/20200422/coronavirus-surges-at-pickaway-prison-now-no-2-hot-spot-in-nation---behind-marion-prison

[36] "Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons*," Los Angeles Times* (March 20, 2020), available at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration

[37] "Achieving A Fair and Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020, available at https://bit.ly/2W9V6oS

[38] "Prisons and Jails are Vulnerable to COVID-19 Outbreaks," *The Verge* (March 7, 2020), available at https://bit.ly/2TNcNZY

the entire country."[39]  One COVID-19 model estimates that jails, as currently managed, could account for 99,000 deaths that have not been recognized by other models.[40]

30.  Courts across the country have found that prisoners are at grave risk.  "Even in the best run prisons, officials might find it difficult if not impossible to follow the CDC's guidelines for preventing the spread of the virus among inmates and staff." *United States v. Esparza*, No. 1:07-cr-00294-BLW, 2020 WL 1696084 (D. Idaho April 7, 2020).  Unfortunately, BOP's efforts have not protected inmates.  *See, e.g., United States v. Atwi,* No. 18-20607, 2020 WL 1910152, at *4 (E.D. Mich. April 20, 2020) ("Positive cases among federal prisoners continue to rise, and it does not appear that preventative measures are sufficiently working yet to flatten the curve in BOP facilities."; *United States v. Razzouk*, No. 11-CR-430 (ARR), Dkt. No. 136 at 8 (E.D.N.Y. April 19, 2020) (BOP's efforts at FCI Otisville "did not protect [defendant] from exposure to the disease in the first instance, despite his vulnerable status.").  *United States v. Muniz,* No. 4:09-cr-199, 2020 WL 1540325, at *1 (S.D. Tex. March 30, 2020) ("While the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers … demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection.").

---

[39] "Explainer: Prisons and Jails are Particularly Vulnerable to COVID-19 Outbreaks," *The Justice Collaborative*, available at https://thejusticecollaborative.com/wpcontent/uploads/2020/03/TJCVulnerabilityof PrisonsandJailstoCOVID19Explainer.pdf

[40] "COVID-19 Model Finds Nearly 100,000 More Deaths Than Current Estimates, Due to Failures to Reduce Jails," ACLU (April 22, 2020), available at https://www.aclu.org/sites/default/files/field document/aclu covid19-jail-report 2020-8 1.pdf

C.  Moore is more likely to suffer severe or fatal effects from COVID-19 because of his age and health conditions.

31.  Older individuals and people with preexisting health issues are particularly at risk of experiencing severe side effects or death because of this virus.  According to the CDC, the following groups are at high risk for severe illness from COVID-19: 1) people 65 and older; 2) people who live in a nursing home or long-term care facility; 3) people with high-risk conditions, such as chronic lung disease or moderate to severe asthma, serious heart conditions, people who are immunocompromised, obese, or have diabetes, renal failure, or liver disease.[41]

32.  Moore possesses some of the high-risk conditions that make him particularly vulnerable to the COVID-19 virus, such as high blood pressure and obesity.  Although Moore is not over 65 years of age, the 40-year-old Moore still has medical conditions which render him vulnerable to COVID-19.[42]  CDC data shows that nearly 40 percent of patients hospitalized from coronavirus were 20 to 54 years old.  In Virginia, 19- to 49-year-olds comprise more than 27 percent of all cases in the state.[43]  In sum, Moore's peculiar susceptibility to COVID-19 while incarcerated, in combination with the mortal risk to Moore given his medical conditions and his age, constitutes an extraordinary and compelling reason warranting Moore's compassionate release.

---

[41] *See* CDC, *People Who are at Higher Risk*, available at
https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html
[42] "Younger Adults Make Up Big Portion of Coronavirus Hospitalizations in U.S.," *The New York Times* (March 20, 2020); available at
https://www.nytimes.com/2020/03/18/health/coronavirus-young-people-html
[43] Virginia Department of Health, *COVID-19 in Virginia*, available at
http://www.vdh.virginia.gov/coronavirus/

III. **Releasing Moore is Appropriate given Moore's History and Characteristics and His Rehabilitation While Incarcerated.**

    A.  <u>Moore is not a danger</u>.

    33.  Moore's sentence should be reduced because Moore is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g). *See* U.S.S.G. § 1B1.13(2). Furthermore, the relevant 18 U.S.C. § 3553(a) factors favor a sentence reduction. During the six years that Moore has been incarcerated, he has availed himself of various classes and self-improvement courses. He is a non-violent offender who has displayed appropriate remorse for his drug distribution offense. It is defense counsel's understanding that Moore has a good disciplinary record during his six-year period of incarceration, including a low security classification. Moore would appear to be an ideal candidate for release and be less likely to recidivate. Moreover, Moore hopes to be approved for home confinement in the home of his 70-year-old mother, Zenola Moore, who lives at 8615 Gilbert Street, Philadelphia, Pennsylvania, and is a retired elementary school teacher. The Defendant's brother, Michael Moore, age 35, resides with their mother and is employed by Whole Foods. Moore believes he could be of great assistance in helping and caring for his 70-year-old mother. Courts have granted release to defendants due to their family circumstances, e.g., to provide care for a dependent where other family members cannot do so due to advancing age and health problems. *See United States v. Kesayan*, No. 2:25-cr-236-JAM, 2020 WL 2039028 (E.D. Cal. April 28, 2020). If, for some reason, the Court felt it could not be approved for home confinement in a home outside the state of Virginia, Moore would propose alternatively that he be approved for home confinement

34. Indeed, by reducing the potential spread of COVID-19 within the prison system, Moore's release would benefit public safety. *See, e.g., United States v. Harris*, No. 19-cr-356, 2020 WL 1482342, at *1 (D.D.C. March 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on … strict conditions."). Allowing Moore to finish out the remaining 121 months of his 202-month sentence in home confinement at the home of his 70-year-old mother, Zenola Moore, who lives at 8615 Gilbert Street, Philadelphia, Pennsylvania, or in the alternative, a halfway house allowing for later transition to home confinement, is the only prudent and just response to the extraordinary circumstances created by the novel coronavirus.

B. The § 3553(a) factors and Moore's rehabilitation weigh in favor of relief.

35. For the last six years, Moore has been serving a 202-month sentence. Despite this, he has tried to make the most of his incarceration by participating in programming and working. He has completed a wide range of courses. He has participated in drug rehabilitation courses. There is no doubt that Moore's prior criminal conduct was serious, involving the distribution of cocaine. The man Moore is today quite different from the man who stood before the Court for sentencing in June 2015. He has support from his family in the community.

C. Moore has a viable release plan.

36. Each day in custody is increasingly risky for Moore, who has no way to practice social distancing or other protective measures that are mandated by health officials throughout the nation, and which promise some hope of surviving the

consequences of infection. Moore has formulated a release plan that will adequately address the concerns presented by the COVID-19 virus, protect the public, and ensure his successful transition into the community. As noted, Moore hopes to finish out the remaining 121 months of her 202-month sentence in home confinement at the home of his 69-year-old mother, Zenola Moore, a retired elementary school teacher who lives at 8615 Gilbert Street, Philadelphia, Pennsylvania, or in the alternative, a halfway house allowing for later transition to home confinement.

## CONCLUSION

37. Moore respectfully requests that this Court order her immediate compassionate release and impose the following supervised release conditions: 1) that Moore abide by the standard supervised release conditions; 2) that within 72 hours of release, Moore contact the U.S. Probation Office by phone for specific reporting instructions; 3) that Moore reside in the home of his 70-year-old mother, Zenola Moore, a retired elementary school teacher who lives at 8615 Gilbert Street, Philadelphia, Pennsylvania (or in the alternative, a halfway house allowing for later transition to home confinement), and be confined at home – except when attending medical appointments or other activities approved by the U.S. Probation Office, for as long as this Court deems necessary.

38. In the alternative, the defense respectfully requests that this Court issue a non-binding recommendation that BOP transfer Moore to home confinement for the maximum period permissible, pursuant to the Coronavirus Aid, Relief, and Economic

Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (March 27, 2020), 18

U.S.C. § 3624(c)(2), the Second Chance Act of 2007, and 18 U.S.C. § 3621.[44]

Respectfully Submitted,


MARLON J. MOORE


By:_____/s/_____
Tyrone C. Johnson, Esq.

By_____/s/_____
Tyrone C. Johnson, Esq.
Virginia State Bar No. 65594
Attorney for Marlon J. Moore
555-D Settlers Landing Road
Hampton, Virginia 23669
Phone: (757) 265-2666
Facsimile: (757) 265-2646
tesquirej@cox.net

---

[44] While BOP has sole authority to determine whether Moore is suitable for transfer to home confinement pursuant to Section 3624, this Court has the power to make a recommendation, and the BOP is required to consider a sentencing court's recommendation as to where a prisoner should serve his sentence. 18 U.S.C. § 3621(b)(4). Such a recommendation is not part of the sentence subject to appeal. *United States v. Smith*, 733 Fed. Appx 86, 88 (4th Cir. 2018), citing *United States v. Ceballos*, 671 F.3d 852, 856 (9th Cir. 2011) (citing other circuits finding the same). Accordingly, sentencing courts may make these "nonbinding recommendations to the Bureau of Prisons at any time." *Ceballos*, 671 F.3d at 856 n. 2.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 30th day of November, 2021, I electronically filed the foregoing with the clerk of court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:  Kevin Patrick Hudson, Assistant United States Attorney, United States Attorney's Office, 101 W. Main St., Suite 8000, Norfolk, VA 23510


By_____/s/_____
Tyrone C. Johnson, Esq.
Virginia State Bar No. 65594
Attorney for Marlon J. Moore
555-D Settlers Landing Road
Hampton, Virginia 23669
Phone: (757) 265-2666
Facsimile: (757) 265-2646
tesquirej@cox.net