IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Newport News Division

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | |
| | ) | Criminal No. 4:15-cr-1 |
| MARLON J. MOORE, | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE**

Comes now the United States of America, by counsel, and files its response in opposition to defendant Marlon Moore's motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). The defendant is currently serving a 240 month sentence at FCI Fort Dix for conspiracy to distribute and possess with intent to distribute cocaine, as well as interstate transportation in aid of racketeering enterprises. He seeks either early release from prison or transfer to a halfway house, citing the coronavirus pandemic, his age, and medical conditions, to include his weight and high blood pressure. The Court should deny his motion because, as explained in more detail below: (1) he has recovered from an asymptomatic bout with the coronavirus; (2) he declined the vaccine; and (3) his underlying offense was quite serious and he still has a substantial portion to serve on his well-merited sentence.

**Background**

**I.  Facts**

On December 12, 2014, Homeland Security agents were driving around a neighborhood in Hampton in search of a fugitive when they saw a vehicle with a man in the driver's seat and a man leaning inside the vehicle. The two appeared to be engaged in a hand-to-hand transaction. This occurred on the same block as the fugitive's last known address. Unable to determine

whether the driver was their fugitive and suspicious of the apparent hand-to-hand transaction, agents made a u-turn on the vehicle, which prompted the man leaning inside the vehicle to get in the car, at which time the car drove off. Agents followed the car for a few blocks until the car came to an abrupt stop and both the passenger and driver doors opened. Agents exited their vehicle, identified themselves as law enforcement, and asked to speak with the driver, later identified as defendant Marlon Moore.

In response, Moore took off running and agents pursued him. Moore was finally ordered to the ground in the backyard of a home on Walnut Street in Hampton. As Moore was getting on the ground, a bag containing 0.71 grams of cocaine base fell from his pocket. Moore was detained and brought back to his vehicle, where agents found more contraband, specifically a metal travel mug containing over 73 grams of crack cocaine in numerous baggies. At that point, Moore was arrested and brought before a Hampton state magistrate. The state magistrate told Moore he would be released on bond if he provided a local address. Moore did and it was an address previously unknown to agents on West Queen Street in Hampton.

Agents obtained a search warrant for the West Queen Street address, where, upon execution, they found even more contraband. Specifically, they discovered a marijuana grow operation, cocaine base, and three guns. One of those guns, a pistol, was located in a microwave, which was one of three stacked microwaves, in the kitchen area of the house. Those microwaves contained numerous packages of inositol and baking soda, common cocaine and crack cocaine cutting agents.

Around the time that the search warrant was being executed at the West Queen Street address, agents became aware that the Postal Inspector and the Virginia State Police had intercepted a package coming from Atlanta, Georgia to the same Walnut Street address in

Hampton where agents had ordered Moore to the ground earlier in the day. The Postal Inspector and the State Police obtained and executed a search warrant on the parcel, which contained 111.9 grams of crack cocaine.

The next day, December 13, 2014, the Postal Inspector, Homeland Security, State Police, and Hampton Police conducted a controlled delivery of the parcel containing cocaine to the address on Walnut Street. A postal inspector acting in an undercover capacity knocked on the door of the residence and someone opened the door and took delivery of the parcel. Prior to making delivery, agents had equipped the parcel with a device that would indicate when the parcel was opened.

After the person took delivery of the parcel, the person went back inside the house. A short time later, the person came out of the house again and looked up and down the street. A short time after that, Moore showed up to the Walnut Street address and went inside. Soon after Moore's arrival, agents got the indication that the package had been opened. Having secured an anticipatory search warrant, agents then executed that warrant.

Inside the Walnut Street address, agents find four occupants plus Moore. The four occupants of the Walnut Street address besides Moore all appeared to have some degree of learning disability. The occupants explained to agents that Moore frequently received parcels at that address. The occupants also told agents that they knew Moore to carry a metal travel mug in his vehicle where he kept bags of crack cocaine.

The occupants also told the agents about another address associated with Moore. A group of agents went to this newly discovered address, where they found two vehicles registered in Moore's name. Agents asked that a Hampton Police canine unit respond, at which time Hampton Police ran their canine on the two vehicles. Once the canine alerted to both vehicles,

agents began to search them, yielding over $10,000 in cash, as well as a few additional grams of crack cocaine and marijuana.

Agents administered the Miranda warning to Moore, who agreed to speak with them. Moore explained that he had been receiving parcels of cocaine from separately prosecuted co-conspirators Aaron Cullars and Lindsey Cullars (in case no. 4:15-cr-11) for about two years. In the span of about eighteen months, Moore deposited over $400,000 in cash as payment for that cocaine into Lindsey's bank accounts.

Moore's PSR showed an offense level of 42 and a criminal history score of category of II for an advisory guidelines range of 360 months to life. Moore was attributed with over twenty-six kilograms of crack cocaine, among other drugs. Moore's guidelines were further enhanced for possession of a firearm, maintaining and drug premises, and a manager/supervisor role. On June 2, 2015, the Court sentenced Moore to 240 months (Document 35). Counsel for Moore filed his motion for compassionate release on November 30, 2021 (Document 64).

With respect to medical conditions, the PSR noted that Moore was in overall good health at the time of his sentencing, but that he did have high blood pressure (Document 31, ¶ 51). The PSR further indicated that Moore had not had any treatment for his blood pressure while detained awaiting sentencing from February 2, 2015 to June 2, 2015. Moore's prison medical records do not appear to show any treatment being administered for high blood pressure, but do show regular monitoring of it. They also show that Moore has had the coronavirus and recovered from it. Moore was offered the vaccine and has been offered testing on numerous occasions. Stunningly, he declined the vaccine and has declined coronavirus tests on occasion. The government will submit the salient records under seal.

II.     **Defendant's motion for compassionate release**

BOP indicates that Moore has never submitted a compassionate release request to the

warden of FCI Fort Dix. Moore's motion indicates just the opposite (Document 64, p. 3). Since the government believes Moore's motion should be denied in any event, it will afford him the benefit of the doubt on this issue. In support of his motion, Moore cites his age, medical condition, a generalized concern about the spread of the coronavirus in prisons, and argues he is not a danger to the community.

### III. BOP efforts to mitigate the effects of the coronavirus

Since the onset of the COVID-19 pandemic, the Bureau of Prisons has adopted measures to contain the spread of the virus within prisons. In appropriate cases, BOP has released inmates for home confinement under 18 U.S.C. § 3624(c)(2), as amended by § 12003(b)(2) of the CARES Act.[1] BOP has also made great progress vaccinating inmates and staff. Further, BOP has limited access to prisons, restricted prisoner movement within prisons, required screening and testing, provided masks and hand cleaners, separated ill inmates from the rest of the population, and educated inmates and staff on preventing the spread of disease.

Before Congress enacted the CARES Act, § 3624(c)(2) authorized BOP to "place a prisoner in home confinement" only "for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months." As part of the CARES Act, Congress sought to address the spread of COVID-19 in prisons by temporarily authorizing BOP to expand the use of home confinement under § 3624(c)(2). Accordingly, during the coronavirus emergency, the Act suspends the limitation that restricts home confinement to the shorter of 10 percent of the inmate's sentence or 6 months, provided that the Attorney General finds that "emergency conditions will materially affect the functioning" of BOP.[2] CARES Act § 12003(b)(2). The Attorney General made those

---

[1] Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES Act").

[2] Section 12003(b)(2) provides that "if the Attorney General finds that emergency conditions

5

findings on April 3, 2020, conferring on BOP the authority to expand its use of home confinement. Memorandum from Attorney General to BOP Director (Apr. 3, 2020), https://www.justice.gov/file/1266661/download.

BOP has been "reviewing all inmates who have COVID-19 risk factors, as described by the Centers for Disease Control and Prevention ("CDC"), to determine which inmates are suitable for home confinement." COVID-19 Home Confinement Information, BOP, https://www.bop.gov/coronavirus/ (last visited December 21, 2021). There are currently 7,751 inmates on home confinement, and the BOP has placed a total of 35,948 inmates in home confinement since March 26, 2020. Id.

Inmates do not have to apply to be considered for home confinement. BOP considers such factors as the "age and vulnerability of the inmate to COVID-19," consistent with CDC guidelines; the security level of the inmate's facility, giving priority to those in low and minimum security facilities; the inmate's conduct while in prison; whether the inmate has a release plan "that will prevent recidivism and maximize public safety"; and the "danger posed by the inmate to the community." Memorandum from Attorney General to BOP Director 1–2 (Mar. 26, 2020), https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf. Additionally, BOP must assess the inmate's risk factors and grant home confinement only after determining that "transfer to home confinement is likely not to increase the inmate's risk of contracting COVID-19." Id. at 2. To protect the public against further spread of the coronavirus, BOP requires every inmate granted home confinement to quarantine for 14 days

---

will materially affect the functioning of the Bureau, the Director of the Bureau may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

6

before his release.  Id.

BOP has also made great strides on administering vaccines to inmates and staff.  As of December 21, 2021, BOP has administered a total of 273,729 doses of the coronavirus vaccine.  COVID-19 Vaccine Implementation, BOP, https://www.bop.gov/coronavirus/.  After offering the vaccine to all employees, institutions will give priority to inmates assigned to work in health service units and inmates in nursing care centers or other residential care units.  COVID-19 Vaccine Guidance, BOP 6 (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf.  Next, priority will be given to inmates age 65 or older and inmates of any age who, based on CDC criteria, "are at increased risk" for severe illness from COVID-19 due to one or more medical conditions.  Id.  The third level of priority for vaccine administration includes inmates between 50 and 64 years old and inmates of any age who, based on CDC criteria, "might be at increased risk" for severe illness from COVID-19 due to one or more medical conditions.  Id. at 7.  Vaccines will then be available to all other inmates.  Id.

BOP is also operating under modified conditions to reduce the spread of COVID-19 in its facilities.  All inmates and staff have been issued facial coverings to use in all indoor environments.  BOP COVID-19 Operational Levels, BOP (December 21, 2021), https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp.  This is so regardless of vaccination status.  Id.  All areas, supplies, and equipment are cleaned at least on a daily basis.  Id.  Inmates are tested for the coronavirus when they are symptomatic, asymptomatic but have been exposed, during movements, and when monitoring is deemed necessary.  Id.

Outside of the general modifications, some of which are described in the paragraph just above, the BOP has implemented a three-tier operations modification system. Under this system, operations in a particular facility are modified as needed based on a combination of indicators. Id. The BOP's website sets forth the criteria as follows:

  

Id. BOP's website likewise has charts depicting some of the ways in which facilities in the three tiers modify operations given the conditions at the facility:

| | Level 1 Operations ② ①○○ | Level 2 Operations ② ○②○ | Level 3 Operations ② ●●● |
|---|---|---|---|
| Cohorting | Modifications not necessary | Modifications not necessary if social distancing is followed | Modifications necessary |
| Inmate Cloth Face Covering | Per DOJ guidance, face covering required at all times in all indoor environments | • Per DOJ guidance, face covering required at all times in all indoor environments<br>• Face covering required when social distancing is not possible outdoors | Follow the full COVID-19 Pandemic Plan including facility-wide use of face coverings, surgical or N95 masks as indicated. |
| Social Distancing | • All health care units and patient care areas<br>• Not necessary in other locations | All areas | All areas |
| Staff Cloth Face Covering | Per DOJ guidance, face covering required at all times in all indoor environments (surgical mask in patient care areas). | • Per DOJ guidance, face covering required at all times in all indoor environments (surgical mask in patient care areas).<br>• Face covering is required when social distancing is not possible outdoors. | Follow the full COVID-19 Pandemic Plan including facility-wide use of face coverings, surgical or N95 masks as indicated. |
| Staff Symptom Screening | Self monitoring/report symptoms of COVID-19 | Self monitoring/report symptoms of COVID-19 | Implement daily COVID-19 symptom screen and temp check prior to entry into the institution (enhanced screening) |

Id. Depending on which level of operations each facility is under, it must also make modifications to barber/beauty shop operations, commissary, phones, laundry, law library operations, programs and services, recreation, transportation, visitation, and work detail. Id.

## IV. Conditions at the defendant's facility

The defendant is currently serving his sentence at FCI Fort Dix, a low security facility in Burlington County, New Jersey. FCI Fort Dix, BOP (December 21, 2021), www.bop.gov/locations/institutions/ftd/. After making his initial appearance in this case, Moore remained detained. Moore's projected release date is December 27, 2031.

FCI Fort Dix has a total of 3,328 inmates. The institution's website shows it as operating at BOP operations tier 3, as described in the section above. Id. As of December 21, 2021,

9

however, FCI Fort Dix has zero active prisoner cases of the coronavirus and a modest four cases among staff. COVID-19 Coronavirus, BOP (December 21, 2021), https://www.bop.gov/coronavirus/. There have been 2,197 full inmate vaccinations administered at FCI Fort Dix. Id. This gives FCI Fort Dix a vaccination rate of just over 66 percent. That vaccination rate is still better than the full vaccination rate of the state to which Moore proposed to return, Pennsylvania. In the Keystone State, 6,856,433 full vaccinations have been administered out of about 12,800,000 residents. COVID-19 Vaccine Dashboard, Pennsylvania Department of Health (December 21, 2021), https://www.health.pa.gov/topics/disease/ coronavirus/Vaccine/Pages/Dashboard.aspx. That is about 53 ½ percent of Pennsylvania's population.

## Argument

### V. The Court should deny the defendant's motion because he has not established an extraordinary and compelling reason for compassionate release

The defendant has not established that this Court should exercise its discretion under § 3582(c)(1)(A)(i) to grant compassionate release. Though Moore cites his age, at 40 years old he is still a relatively young man. While he has elevated to high blood pressure, this fact did not seem to negatively impact his bout with the coronavirus, which prison medical records reveal was asymptomatic. In addition to the natural immunity Moore has acquired through having the virus, Moore was offered an opportunity for additional protection through the amazing effective Moderna vaccine, which he declined. Further, Moore has failed to appear for coronavirus testing when offered, suggesting he is not as concerned with the virus as he asserts in his motion.

Section 3582(c)(1)(A) authorizes a Court to reduce a term of imprisonment when "extraordinary and compelling reasons warrant such a reduction." Although the statute "does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate

release," the Sentencing Commission has "addressed the issue in a policy statement." United States v. McCoy, 981 F.3d 271, 276 (4th Cir. 2020). According to the policy statement, "extraordinary and compelling reasons" may exist based on the defendant's medical condition, age, family circumstances, or other reasons as determined by BOP. U.S.S.G. § 1B1.13. If a District Court finds that extraordinary and compelling reasons exist, the court may not reduce a sentence before "considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable." § 3582(c)(1)(A). The defendant bears the burden of proving that he is entitled to relief under § 3582(c)(1)(A). United States v. Weaver, No. 1:17-CR-235, 2020 WL 4810123, at *2 (E.D.Va. Aug. 18, 2020); United States v. Morgan, 473 F. Supp. 3d 544, 547 (D.S.C. 2020); United States v. Edwards, 451 F. Supp. 3d 562, 565 (W.D.Va. 2020).

The Fourth Circuit's decision in McCoy does not reduce the defendant's burden of establishing an "extraordinary and compelling" reason for relief under § 3582(c)(1)(A). In McCoy, the court held that the policy statement in U.S.S.G. § 1B1.13 is not "applicable" to compassionate release motions brought by defendants under § 3582(c)(1)(A). McCoy, 981 F.3d at 281–82. Since § 1B1.13 "was adopted before the First Step Act" and specifically mentions only motions brought by BOP, the Court reasoned that the policy statement does not apply to motions brought by defendants. Id. at 282. Absent an applicable policy statement, District Courts should "make their own independent determinations of what constitutes an 'extraordinary and compelling reason[]' under § 3582(c)(1)(A), as consistent with the statutory language." Id. at 284. The Fourth Circuit noted, however, that § 1B1.13 "remains helpful guidance even when motions are filed by defendants." Id. at 282 n.7 (citing United States v. Gunn, 980 F.3d 1178, 1180 (7th Cir. 2020) (observing that "[t]he substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of 'extraordinary

11

and compelling reasons'" and that "a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused," such that the policy statement "can guide discretion without being conclusive")). Accordingly, the Fourth Circuit has continued to reference § 1B1.13 as a guidepost for compassionate release motions even after McCoy. See, e.g., United States v. Trotman, 837 Fed.Appx. 187, 189 (4th Cir. 2020); United States v. Adamson, 831 Fed.Appx. 82, 83 (4th Cir. 2020). Courts in this district have followed suit. See, e.g., United States v. Nabaya, No. 3:17-cr-3, 2021 WL 54361, at *6 (E.D.Va. Jan. 6, 2021); United States v. Prater, No. 3:13-cr-133, 2021 WL 54364, at *3 (E.D.Va. Jan. 6, 2021); Perkins v. United States, No. 2:18-cr-177, 2020 WL 7364222, at *2 (E.D.Va. Dec. 15, 2020); United States v. Reid, No. 2:02-cr-172-7, 2020 WL 7318266, at *2 (E.D.Va. Dec. 10, 2020).

After McCoy, defendants still must "meet the heightened standard of 'extraordinary and compelling' reasons [to] obtain relief" under the statute. McCoy, 981 F.3d at 287; Gunn, 980 F.3d at 1180 ("The statute itself sets the standard: only 'extraordinary and compelling reasons' justify the release of a prisoner" under § 3582(c)(1)(A)(i).). The Fourth Circuit's decision maintains that § 3582(c)(1)(A)(i) "set[s] an exceptionally high standard for relief" and that the "extraordinary and compelling reasons" standard is reserved for "the truly exceptional cases." McCoy, 981 F.3d at 287-88.

Courts have held that the coronavirus pandemic, by itself, is not a sufficient basis for compassionate release. See, e.g., United States v. Thompson, 984 F.3d 431, 435 (5th Cir. 2021) ("Fear of COVID doesn't automatically entitle a prisoner to release."); Raia, 954 F.3d at 597 ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release …."); United States v. Miller, No. 3:16-cr-121, 2020 WL 4547809, at *5 (E.D.Va. Aug. 6, 2020) (Defendant "cannot

rely merely on a fear of contracting COVID-19 as grounds for compassionate release." (internal quotation marks omitted)); United States v. Day, 474 F.Supp.3d 790, 805 (E.D.Va. 2020) ("[W]hile the global health crisis is no doubt extraordinary, it affects all prisoners; and the risk of being infected by COVID-19, standing alone, fails to justify an inmate's compassionate release."); Feiling, 453 F.Supp.3d at 842 ("[T]he threat of COVID-19 exists both in- and outside of prison walls, and Defendant's fear of contracting COVID-19 cannot justify his release."). "Indeed, a general fear of contracting COVID-19, without a sufficient basis for that fear, does not provide an extraordinary and compelling reason for a defendant's release." United States v. Chandler, No. 3:15-mj-122, 2020 WL 6139945, at *5 (E.D.Va. Oct. 19, 2020); United States v. Evans, No. 3:00-cr-63, 2020 WL 5121331, at *5 (E.D.Va. Aug. 31, 2020) ("[A] 'fear' of contracting COVID-19[] … will not suffice as an 'extraordinary and compelling' reason for sentence reduction under 18 U.S.C. § 3582(c)(1)(A)."). Instead, "[i]n the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." Adamson, 831 Fed.Appx. at 83 (quoting Feiling, 453 F.Supp.3d at 841); United States v. Blevins, 832 Fed.Appx. 192 (4th Cir. 2020).

In this case, the defendant has not met the "heightened standard" of demonstrating an "extraordinary and compelling" reason for relief. Therefore, the Court should deny his motion for compassionate release. Indeed, Moore has had the coronavirus, but was asymptomatic, and has recovered. There is therefore no reason to guess at how Moore will react if infected since that infection has already happened with no discernable negative impact on Moore's health.

"To establish a particularized susceptibility to COVID-19, courts have required defendants to provide evidence that they suffer from a medical condition identified by the [CDC]

as a COVID-19 risk factor." Chandler, 2020 WL 6139945, at *5. Here, prison medical records and the PSR do show that Moore has high blood pressure. See generally Understanding Blood Pressure Readings, American Heart Association (December 21, 2021), https://www.heart.org/en/health-topics/high-blood-pressure/understanding-blood-pressure-readings. Hypertension is a condition that the Centers for Disease Control characterize as one that can "possibly" make one more likely to get severely ill from the coronavirus. COVID-19 People with Certain Medical Conditions, Centers for Disease Control and Prevention (December 21, 2021), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html. With Moore, however, there is no need to pour over data about others in an effort to suss out how Moore might react if he contracted the virus. After all, he did contract the virus, was asymptomatic, recovered, and appears to have no long term health damage from it.

The Moderna vaccine Moore was offered is an outrageously effective one at over 90 percent effectiveness at preventing coronavirus, according to the CDC. See Moderna COVID-19 Vaccine Overview and Safety, Centers for Disease Control (December 21, 2021), https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines/Moderna.html. After a booster, the Moderna vaccine remains very effective even against the new omicron variant. Moderna says its booster significantly raises the level of antibodies to thwart Omicron, New York Times (December 21, 2021), https://www.nytimes.com/2021/12/20/health/moderna-covid-booster-omicron.html. Although Moore has the right to decline vaccination, "he cannot simultaneously claim that he must be released because of the risk of complications while refusing a vaccine that could virtually eliminate that risk." United States v. Jackson, No. 15-cr-260(7), 2021 WL 806366, at *2 (D.Minn. Mar. 3, 2021); United States v. Williams, No. CR-17-1279-1, 2021 WL 321904, at *3 (D.Ariz. Feb. 1, 2021) (finding that the defendant's refusal of

the vaccine was "inconsistent with his position that he believes he is at increased risk from the virus"). Otherwise, it "would encourage inmates to avoid" precautions "that will help reduce the spread of COVID-19 within the prison system in hopes that a court will find them at risk and release them, defeating the ultimate goal of both the BOP and the courts in helping stem the spread of COVID-19." United States v. Feiling, No. 3:19-cr-112, 2020 WL 5047064, at *7 (E.D.Va. Aug. 26, 2020) (finding that the defendant had not established extraordinary and compelling reasons for compassionate release because he refused BOP's offer to place him in medical isolation in order to preserve his housing assignment); United States v. Lohmeier, No. 12 CR 1005, 2021 WL 365773, at *2 (N.D. Ill. Feb. 3, 2021) (ruling that a defendant "cannot reasonably expect that prolonging his risk by declining vaccination will be rewarded with a sentence reduction"); United States v. Zambrano, No. 18-CR-2002, 2021 WL 248592, at *5 (N.D.Iowa Jan. 25, 2021) (finding that "it would be inappropriate to reward" the defendant's "refusal to protect herself" with the COVID-19 vaccine "by granting her release").

Further, the defendant's decision to refuse the vaccine undermines his complaints of poor conditions at FCI Fort Dix related to the virus, complaints which are undermined by the statistics set forth above. He could have chosen to help improve those conditions for himself and his fellow inmates by getting vaccinated, but chose not to.

### VI. The Court should deny the defendant's motion because the statutory sentencing factors do not support release.

Even if the Court takes a different view and determines that the defendant has demonstrated an extraordinary and compelling reason for compassionate release, it should deny the defendant's motion because the statutory sentencing factors weigh against release. Section 3582(c)(1)(A) requires a Court to consider the factors set forth in 18 U.S.C. § 3553(a) before reducing a defendant's sentence. Those factors include "the nature and circumstances of the

underlying offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence and protect the public from further crimes of the defendant." Prater, 2021 WL 54364, at *4 (citing 18 U.S.C. § 3553(a)(1)–(2)). Section 3553(a) also instructs Courts to "consider the kinds of sentences available and the sentencing range established for the offense." Nabaya, 2021 WL 54361, at *4 (quoting 18 U.S.C. § 3553(a)(4)). Further, the Sentencing Commission policy statement, U.S.S.G. § 1B1.13, instructs Courts to consider the factors set forth in 18 U.S.C. § 3142(g), including "the nature and circumstances of the offense charged …; the history and characteristics of the person …; [and] the nature and seriousness of the danger to any person or the community that would be posed by the person's release." Id. (quoting 18 U.S.C. § 3142(g)). Additionally, "the Sentencing Commission has emphasized that a defendant's rehabilitation while incarcerated," by itself, is "insufficient to warrant a sentence reduction." Prater, 2021 WL 54364, at *4 (citing U.S.S.G. § 1B1.13, application note 3). In this case, the relevant statutory sentencing factors do not support compassionate release.

Moore's offense conduct was not only serious, it evinced a degree of incorrigibility that undermines the idea that he is not a danger to the community. As noted above, for two years Moore was involved in using the U.S. Postal Service as an unwitting drug mule to move crack cocaine from Georgia and Pennsylvania to the Hampton Roads area. In doing so, he remitted over $400,000 back to his source of supply through promotion money laundering. In all, he was attributed with over twenty-five kilograms of crack cocaine, an especially addictive substance that causes great damage to both the individual and the community. Exacerbating matters, Moore was arrested after a foot pursuit, distribution quantities of crack cocaine were found,

Moore was released on bond, and the very next day went back to pick up another parcel of crack. Multiple firearms were discovered at an address maintained by Moore, as was a multi-microwave cocaine-to-crack conversion operation. The PSR shows that this was not Moore's first drug trafficking conviction, either (Document 31, ¶ 34). Further, prison records show that Moore's time at FCI Fort Dix has not been infraction-free. He has been disciplined twice, once for being insolent to staff and another time for interfering with taking count.

Courts in this circuit consistently have denied compassionate release based on the seriousness of the defendant's offense. See, e.g., Reid, 2020 WL 7318266, at *3 (finding that the statutory sentencing factors weighed against release where the defendant had "served as a 'manager' in a vast drug-trafficking conspiracy" and "continued his wrongful conduct even after his arrest by directing a co-conspirator to collect drug proceeds"); Albury v. United States, No. 2:19-cr-68, 2020 WL 6779643, at *5 (E.D.Va. Oct. 23, 2020) (finding that the statutory sentencing factors weighed against release where the defendant "was convicted of a large-scale drug trafficking crime that he conducted over the course of five years," "possessed firearms," and "often travelled interstate to purchase and sell drugs"). The Court should do the same in this case.

Courts in this district "have considered the length of time served an important factor when ruling on motions for compassionate release during the COVID-19 pandemic." Evans, 2020 WL 5121331, at *7 (finding, even though the defendant's health conditions presented "extraordinary and compelling reasons" for release, that release after the defendant had served "well under half of her sentence[] would not provide just punishment or afford adequate deterrence for like offenses" (internal quotation marks omitted)); Lloyd, 2020 WL 4501811, at *3 (finding, where the defendant "ha[d] served less than half of his sentence even when

17

sentencing credits [were] considered," that "[t]he need to provide adequate deterrence for this Defendant" and "to avoid unwarranted sentencing disparities" weighed against release); United States v. Hill, No. 3:14cr114, 2020 WL 6049912, at *5 (E.D.Va. Oct. 13, 2020) (denying compassionate release where the defendant had "served only 40% of his 188 month sentence, which may not afford adequate deterrence to his criminal conduct"). Approximately 67 months ago, the Court sentenced Moore to 240 months. Moore has served well under half his sentence, a factor that should weigh against the relief he seeks.

Moore's offense conduct was quite serious, he has had infractions while incarcerated, and he has served significantly under half of his sentence. Although Moore does have high blood pressure and is overweight, he has had the virus and has recovered from it with no noticeable complications. Further, he has refused to take steps to protect himself, including by getting vaccinated and by accepting all opportunities for testing afforded to him. For these reasons, the government respectfully urges the Court to deny his motion for compassionate release.[3]

    Respectfully submitted,

    JESSICA D. ABER
    UNITED STATES ATTORNEY

By:    /s/ Kevin Hudson
    Kevin Hudson
    Assistant United States Attorney
    Virginia State Bar No. 81420
    Attorney for the United States
    721 Lakefront Commons, Suite 300
    Newport News, VA 23606
    Office Number: (757) 591-4000
    Facsimile Number: (757) 591-0866
    Email Address: kevin.hudson@usdoj.gov

---

[3] Should the Court determine that the defendant is entitled to compassionate release, the Court should require the defendant to complete a 14-day quarantine controlled by BOP prior to his release.

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 21st day of December 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of the filing (NEF) to all counsel of record.

By:    /s/ Kevin Hudson
       Kevin Hudson
       Assistant United States Attorney
       Virginia State Bar No. 81420
       Attorney for the United States
       721 Lakefront Commons, Suite 300
       Newport News, VA 23606
       Office Number: (757) 591-4000
       Facsimile Number: (757) 591-0866
       Email Address: kevin.hudson@usdoj.gov